United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| DEENA L. DIAS,<br>    Plaintiff,<br>v.<br>NANCY A. BERRYHILL,<br>    Defendant. | Case No. 18-cv-03233-RMI<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**<br>Re: Dkt. Nos. 19, 20 |

Plaintiff, Deena Dias seeks judicial review of an administrative law judge ("ALJ") decision denying her application for disability insurance benefits under Title II of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 7, 11), and both parties have moved for summary judgment (dkts. 19, 20). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary judgment.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Chater*, 108

F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

**PROCEDURAL HISTORY**

On October 10, 2013, Plaintiff filed an application for disability insurance benefits under Title II, alleging disability beginning on June 21, 2009. *See Administrative Record "AR"* at 15.[1] The claim was denied initially on March 14, 2014, it was denied again upon reconsideration on October 10, 2014, and following a hearing, the ALJ denied the application on March 15, 2017. *Id*. at 15, 20. The Appeals Council denied Plaintiff's request for review on March 27, 2018. *Id*. at 1-3.

**SUMMARY OF THE RELEVANT EVIDENCE**

Plaintiff's application for Title II benefits alleged disability due to spondylolisthesis of the spine, spinal fusion surgery, osteoarthritis in both knees, shattered T12 vertebrae, and chronic pain syndrome. *Id*. at 18; *see also* Pl.'s Mot. (dkt. 19) at 9. The ALJ found the following conditions were severe: spondylolisthesis status-post fusion and osteoarthritis affecting both knees. *AR* at 17. In this court, Plaintiff argues: that the ALJ erred by rejecting Plaintiff's pain and limiting effects testimony; that the ALJ erred by rejecting lay witness testimony along the same lines; and, that the above-mentioned errors caused the ALJ to err again at Step-5 by asking the Vocational Expert ("VE") to consider an incomplete and inaccurate hypothetical question pertaining to Plaintiff's capacity to function in the workplace. *See* Pl.'s Mot. (dkt. 19) at 7, 13-19. Accordingly, the following is a summary of the portions of the record that are relevant to the resolution of these claims.

*Medical Evidence:*

On June 22, 2009, Plaintiff was transported by air to Santa Rosa Memorial Hospital as a

---

[1] The AR, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #14. *See* (dkts. 14-1 through 14-14).

"trauma alert" from the Mendocino Coast Hospital where she was taken following an accident during which, as a passenger, she was thrown from the back of a motorcycle, suffering a series of back and spine injuries. *AR* at 302. Specifically, the operator of the motorcycle had executed a jump, and when the motorcycle landed Plaintiff was thrown into the air, hitting the ground in a vertical sitting position. *Id*. at 536. The physical shock of Plaintiff's impact with the ground was so severe that, among other damage, compression forces caused a "burst fracture" of her T12 vertebra. *Id*. at 291.[2] Initially, a CT scan of her pelvis, chest, and abdomen showed a compression fracture of the L1 vertebra with 50 percent retropulsion (displacement of the vertebral body into the spinal canal) and narrowing of the canal. *Id*. at 302. A subsequent MRI scan, however, indicated that the damaged area was slightly further up her spine, at the T12, rather than the L1, vertebra; accordingly, Plaintiff was transferred from trauma services, to the intensive care unit for neurologic checks, cardiac monitoring, pain control, and consultation. *Id*. at 303. When after a week it became clear that Plaintiff "was not able to progress with her therapies due to pain[,] Eldan B. Eichbaum, MD, re-examined her, ordered repeat scans of her back, and felt that surgical intervention would be warranted." *Id*. Thereafter, on June 29, 2009, Plaintiff underwent the first attempt at remedial surgery in the nature of vertebrectomy (the removal of some or all of the shattered vertebral body of her T12 vertebra such as to decompress the spinal cord and nerves) and a spinal fusion (using an "expandable titanium cage and ventrolateral screw-rod fixation for a burst fracture" to fuse together her T11 and L1 vertebrae such that they would heal into a single, solid bone). *Id*. at 303, 449, 450. Plaintiff was then returned to the intensive care unit for recovery, and was not discharged for more than three weeks as her physicians found that she "was very slow to mobilize with physical therapy and occupational therapy due to pain." *Id*.

Three months later, Dr. Eichbaum observed that "[s]he has low back pain, but mainly in the lumbosacral junction which radiates up into the mid to upper lumbar region." *Id*. at 450. The

---

[2] A "burst fracture" involves compressive failure of the vertebral body, and depending on the degree of severity, vertebral bone fragments can be lodged in surrounding tissues or in the spinal cord. *See* Wheeless, C., Duke University Medical Center, *Wheeless' Textbook of Orthopaedics*, available at: http://www.wheelessonline.com/ortho/burst_frx_of_spine (last checked 09/16/2019 at 10:00 am).

following month, in November of 2009, Dr. Eichbaum again observed that Plaintiff "has significant pain in the lumbosacral junction." *Id*. at 449. In March of the following year, Dr. Eichbaum noted that "[s]he continues to have low back pain," and opined two possible causes: (1) "that the majority of her low back pain is probably due to her L5-S1 spondylolisthesis (a slipping of the vertebra), which was probably present prior to her injury and only became symptomatic after her injury"; or, (2) that "[i]t is also possible that the fusion and fixation at the thoracolumbar junction may be putting some stress at the L5-S1 level, exacerbating her symptoms as well." *Id*. at 447. In an effort to address Plaintiff's persistent pain, Dr. Eichbaum referred her for facet block injections into one or more of the small joints located along the sides of the L5-S1 vertebrae. *Id*.

One year after her surgery, in June of 2010, Dr. Eichbaum observed that while Plaintiff still had "persistent pain in her low back and lumbosacral junction," that she now also had mild pain in the midthoracic spine and leg pain. *Id*. at 446. At this point, Dr. Eichbaum opined that Plaintiff's "severe back pain and intermittent leg pain" would eventually necessitate further surgery in the nature of an "L5-S1 anterior posterior fusion due to her grade I-II L5-S1 spondylolisthesis." *Id*. Fifteen months after her surgery, in September of 2010, Dr. Eichbaum noted that Plaintiff "continues to have significant back pain in the lumbosacral junction with leg pain posterior and laterally." *Id*. at 444. Approximately, two years after her surgery, Dr. Eichbaum noted in May of 2011 that Plaintiff still had persistent low back pain compounded by the L5-S1 spondylolisthesis, and that while working on resubmitting the surgery request to Medi-Cal for approval, Plaintiff would undergo an EMG and a nerve conduction study at UC Davis. *Id*. at 443.

In October of 2011, Dr. Eichbaum confirmed that because Plaintiff continued to suffer from "progressive back and leg pain," and having "failed nonoperative modalities," Plaintiff should indeed undergo a second surgery. *Id*. at 289-96. Having lived with chronic and progressively worsening pain for more than two years, and even when faced with the most dire of warnings about the risks[3] associated with such an operation, Plaintiff nevertheless chose to

---

[3] Dr. Eichbaum warned Plaintiff that surgically fusing her L5 and S1 vertebrae to abate her chronic pain was attended with a risk of even greater chronic pain without improvement, chronic numbness, failure to improve, nerve injury, leg weakness, possible paraplegia, bowel and bladder dysfunction, infection requiring reoperation, hematoma requiring reoperation, cerebrospinal fluid

4

proceed. *Id*. at 291-92. Accordingly, Plaintiff underwent the second operation on October 31, 2011, where Dr. Eichbaum first performed a laminectomy (enlarging the spinal canal) on Plaintiff's L5 and S1 vertebrae, as well as a facetectomy (involving a decompression of a spinal nerve root) on the L5 vertebra; Dr. Eichbaum then fused Plaintiff's L5 and S1 vertebrae together on the post-lateral side by "using spinous process laminar autograft bone, allograft bone chips, and calcium triphosphate putty," and finally, Plaintiff's L5 and S1 vertebrae were fixed together on the posterior side by using a 45mm rod, a number of screws, and an assortment of other hardware. *Id*. at 294. Two weeks later, after having her surgical staples removed, Diane L. Harris, M.D., treated Plaintiff for persisting back pain and increased dosages of her previously prescribed pain medications in the form of Methadone and Norco. *Id*. at 388.

In June of 2012, Plaintiff was treated for continuing pain by her primary care providers at the North Coast Family Health Center; and, as reflected in the records kept by Sharon Hunter, F.N.P., Plaintiff was assessed with chronic pain syndrome and muscle spasms, for which FNP Hunter decided to "put her back on her methadone at 10 mg three per day," as well as Norco and muscle relaxants, noting that "[s]he may need to take more until the methadone is therapeutic." *Id*. at 387. The following month, FNP Hunter observed that Plaintiff still had persistent pain, which was addressed by increasing her methadone dose from 30mg to 40mg per day, while decreasing her Norco dosage from 40mg to 20mg per day. *Id*. at 386. In September of 2012, FNP Hunter noted that Plaintiff's chronic pain had not diminished, necessitating continuing her at the same levels of pain medications, while adding other medications for her pain-induced insomnia, as well as a prescription for a high dose of Motrin for joint discomfort and stiffness. *Id*. at 385. Thereafter, under the supervision of Benjamin Graham, M.D., FNP Hunter treated Plaintiff again in October of 2012, noting persisting back pain and leg cramps; once again, Plaintiff was continued on her pain medications with refills for the following three months until her next appointment in February of 2013. *Id*. at 384. During the February 2013 examination, FNP Hunter observed that

---

leaking and requiring repair, failure or misplacement of the surgical instrumentation requiring reoperation, injury to the bowels or other organs requiring reoperation, possible failed vertebral fusion requiring reoperation, or death.

the chronic pain persisted, while the leg cramps had improved, and Plaintiff was continued on the same regimen of pain medicine for another two months. *Id*. at 384. Shortly thereafter, in October of 2013, Plaintiff filed her application for disability insurance benefits. *Id*. at 15. In December of 2013, Plaintiff once again found herself at the Mendocino Coast District Hospital, this time, after being the victim of an assault. *Id*. at 558. Hospital records reflect that, during a domestic altercation, Plaintiff's "boyfriend shoved her into a doorjamb and she struck her left back." *Id*. Plaintiff suffered bruising to her left arm and right leg, in addition to her back, as a result of the assault; consequently, she was continued on her 40 mg per day Methadone dose, while her dose of Norco was increased to 40 mg per day, as well as being administered a number of other medications for inflammation and insomnia. *Id*. at 555-56.

The following month, in January of 2014, Plaintiff underwent a one-time consultative examination by Sanford Brown, M.D., at the request of the state agency. *Id*. at 536. Dr. Brown's impression was that Plaintiff suffered from "[c]hronic back and leg pain secondary to a T12 burst fracture, despite two operative interventions." *Id*. at 537. Dr. Brown also noted that Plaintiff's range of motion in the dorsolumbar area was abnormal in that it "demonstrates only 30 degrees of flexion." *Id*. While concluding that Plaintiff's chronic leg and back pain "will impose limitations for 12 or more continuous months," Dr. Brown opined that in a typical workday, Plaintiff could: stand or walk for up to 4 hours; sit for up to 4 hours; lift less than 10 pounds occasionally and 10 pounds frequently[4], but without stooping to pick up weight; that Plaintiff should not engage in climbing, balancing, stooping, kneeling, crouching, and crawling; and, that there are no limitations on Plaintiff's ability to reach, handle, finger, or feel things. *Id*. at 537-38. A few weeks later, in February of 2014, FNP Hunter again assessed Plaintiff as suffering from continuing chronic back pain that was prone to exacerbations coupled with tenderness over the "expansion device" that was placed where her T14 vertebra used to be; specifically, FNP Hunter noted that Plaintiff continued to experience chronic pain in her lumbosacral spine as well as in her thoracic spine. *Id*. at 550, 552. In May of 2014, FNP Hunter described Plaintiff as still suffering from chronic pain and an

---

[4] This appears to be a mistake because only being able to occasionally lift less than 10 pounds is inconsistent with being able to frequently lift 10 pounds.

6

inability to be active or to do most household chores. *Id*. at 546.

Thereafter, between June of 2014, and the hearing before the ALJ in August of 2016, Plaintiff was seen by her primary care providers at the North Coast Family Health Center and treated with high dosages of opiates for her chronic pain at least twenty times, essentially, every other month; during this period Plaintiff was consistently assessed as suffering from chronic pain syndrome, chronic back pain, pain in both knees, insomnia, decreased activity due to the pain, and it was consistently noted that her pain was aggravated by daily activities and that it was abated by lying down and taking pain medication. *See id*. at 572, 568, 584, 587, 663, 592, 597, 602, 606-09, 611, 616, 619, 621, 624, 626, 628, 631, 634, 638, 641, 644, 649, 653, 657-58, 659. During this period, FNP Hunter described Plaintiff's "burning, deep and diffuse" back pain as occurring persistently in the middle and lower back, and such that would be exacerbated by bending forward, bending over, or during a twisting movement, and that Plaintiff's "[s]ymptoms are aggravated by ascending stairs, bending, coughing, lifting and pushing." *Id*. at 597. Additionally, diagnostic imaging performed on Plaintiff's knees in January of 2015 showed moderate osteoarthritis in Plaintiff's left knee at the patellofemoral joint (*id*. at 663), and a MRI image of her lumbar spine taken in 2016 showed the following abnormalities: grade-1 spondylolysthesis at the L5-S1 vertebrae; broad-based disc protrusion into the L3-L4 disc space causing a "moderate narrowing of the left L3 neural foramen"; and, moderate degenerative arthritis in the facet joint at the L4-L5 vertebrae. *Id*. at 657-87.

Lastly, in 2015 Plaintiff's primary care treatment providers formed the opinion that one or both of Plaintiff's surgical operations of the prior six years had been unsuccessful. On September 4, 2015, Michael Yang, M.D., examined Plaintiff and observed that her "[s]ymptoms are aggravated by changing positions, daily activities, cold weather and sudden movement . . . and that the [s]ymptoms are relieved by lying down and [taking] pain meds/drugs." *Id*. at 606, 610. Noting Plaintiff's 6-year history of grappling with chronic pain since her accident, Dr. Yang assessed Plaintiff as also suffering from lumbar radiculopathy (an irritation or compression of the spinal nerve roots), back pain, and from "lumbar failed back surgery syndrome." *Id*. at 609. Observing that Plaintiff experiences "[l]ower back pain on flexion to 30 degrees," Dr. Yang added

7

that a review of Plaintiff's CT scan from 2013 showed a number of "post-operative changes at L5/S1 from laminectomy, discectomy, and A/P fusion." *Id*. Consequently, he scheduled Plaintiff for further pain treatment in the form of a "bilateral L5/S1 transforaminal epidural steroid injection," and further pain management with medication. *Id*. The following month, Dr. Yang's colleague at the North Coast Family Health Center, Jason Pope, M.D., concurred in the opinion that Plaintiff's surgeries had been unsuccessful. *Id*. at 616-20. In addition to lumbar radiculopathy, Dr. Pope also assessed Plaintiff as suffering from "failed back surgical syndrome." *Id*. at 619. A few weeks later, in November of 2015, Dr. Yang examined Plaintiff again and added a diagnosis of "[p]ostlaminectomy syndrome, not elsewhere classified." *Id*. at 621, 624.

*Hearing Testimony & Function Report:*

In November of 2013, Plaintiff's mother submitted a third-party function report in relation to Plaintiff's application. *Id*. at 204-11. Ms. Dias noted on the form, in response to a question asking how her daughter's conditions limit her ability to work, "back pain, can't move, has trouble bending over, can't stand for a long time, stays in bed a lot." *Id*. at 204. While hardly a model of specificity, as much of the questionnaire was left blank, Ms. Dias's function report did manage to communicate that, due to Plaintiff's back surgeries and persisting pain, Plaintiff was "unable to do the[] [following] activities": lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and completing tasks. *Id*. at 209. Ms. Dias added that "[s]ince her back injury [Plaintiff] doesn't get out . . . she stays at home in bed," and that Plaintiff's regimen of methadone "makes her sleepy[,] drowsy." *Id*. at 209, 211.

In August of 2016, the ALJ conducted a hearing on Plaintiff's application during which Plaintiff answered a number of questions by the ALJ and then by counsel, through which some relevant evidence as to Plaintiff's pain was established, but through which very little can be gleaned with regards to the contours of Plaintiff's functional limitations. The hearing established that Plaintiff was born in 1970, and lived with her mother in Fort Bragg, California. *Id*. at 33. When asked if she could have driven herself to the hearing, Plaintiff responded, "[p]robably not." *Id*. at 34. After asking about Plaintiff's prior employment at a grocery store and as a nursing assistant, the ALJ asked Plaintiff to describe what exactly prevents her from working; Plaintiff

8

responded that "when I stand up for too long, my legs get cramped, and my back hurts." *Id*. at 34-37. When the ALJ asked Plaintiff if, despite the motorcycle accident and the assault, whether the two surgeries and epidural injections had improved her condition, Plaintiff responded that ever since her second spinal fusion surgery, "I think it hurts worse that it did before." *Id*. at 34-40. Plaintiff then related that she experiences some degree of difficulty negotiating stairs, shopping, driving, and standing for a duration long enough to cook meals. *Id*. at 40. When asked what she does with her time, Plaintiff related that she mostly reclines in her bed and reads, "[b]ecause when I get up and start moving around my back starts hurting." *Id*. at 42. Plaintiff added that her daughter helps her with household chores, and that while she can still fold laundry while sitting, she could not pick up a full laundry basket, as the last time she attempted that, "something in [her] lower back snapped." *Id*. at 43. When asked why physical therapy didn't help the arthritis in her knees, Plaintiff responded that "[t]hey stopped because my knees were like crunchy." *Id*. at 44.

The ALJ then proceeded to ask the Vocational Expert ("VE") to identify Plaintiff's past relevant work, which the VE identified as: sandwich maker, cashier II, stock clerk, and nurse's assistant. *Id*. at 46. The ALJ then asked the VE whether a hypothetical person of Plaintiff's age, education, and job history could perform this past relevant work if they were limited to sedentary work but retained the ability to stand and walk for up to three hours in an eight-hour work day, needing to shift positions every 45 minutes to an hour, unable to climb ladders or scaffolds but able to perform other postural maneuvers such as stooping, crouching and crawling on an occasional basis, occasionally reaching overhead, and avoiding extreme heat and cold, vibrations, hazards, unprotected heights, and moving machinery. *Id*. at 46-47. The VE answered in the negative, and when asked if there were other jobs in the national economy that such a person could perform, the VE identified employment as an election clerk, call-out operator, or a charge account clerk. *Id*. at 47-48. The ALJ then asked the VE whether there would remain any employment for such a person if they were "[o]ff task 20 percent of the work day or work week," to which the VE responded in the negative and added that such a person "would be unable to perform the essential functions of that job or any job." *Id*. at 48.

//

*The ALJ Decision:*

On this record, the ALJ concluded that Plaintiff retained the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), but with relaxed limitations in that the ALJ found that Plaintiff could still stand or walk for three hours out of an eight-hour workday, shifting positions every 45 minutes to an hour; and, that Plaintiff could also perform occasional postural activities (such as stooping, crouching and crawling), and occasional overhead reaching, but that she must avoid concentrated exposure to extreme heat or cold, and avoid even moderate exposure to vibration and hazards. *AR*. at 18. The ALJ began by characterizing Plaintiff's 2009 accident in a somewhat simplified fashion, describing it as happening "when the claimant was riding on the back of a motorcycle that went over a jump, causing pain upon landing." *Id*. at 19. The ALJ then noted that while it was credible that Plaintiff's allegations that her pain medication did not provide "total pain relief," nevertheless, "her alleged inability to function due to back pain are (sic) not consistent with the medical record." *Id*.

Placing great reliance on the notion that "[s]he has never reported the need to stay in bed all day," the ALJ found that, while Plaintiff's back pain could preclude prolonged standing and walking, "there is no basis for her alleged need to spend the day reading in bed." *Id*. at 19-20. In support of this conclusion, the ALJ added that during the disability period, Plaintiff has at times been "able to prepare meals, do errands, clean the house and do laundry with help from her children, and drive a car." *Id*. at 20. The ALJ added that "great weight" was given to the opinion of the consultant examiner, Dr. Brown, who examined Plaintiff on a single occasion and opined that she could stand or walk for up to half of the eight-hour workday and that she could occasionally (or frequently) lift and carry 10 pounds. *Id*. The ALJ found that Dr. Brown's opinion as to Plaintiff's ability to stand for half of the workday "is consistent with the above residual functional capacity and the evidence of bilateral knee osteoarthritis." *Id*. Lastly, the ALJ noted that the third-party function report had been considered and that "[t]he medical record does not support the level of dysfunction described. The claimant never reported she is bedbound and completely unable to do household chores . . . [and] the claimant's ability to take care of personal hygiene and grooming suggests that her functioning is less limited than indicated." *Id*. at 21.

10

# THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY

A person filing a claim for social security disability benefits ("the claimant") must show that she has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[5] The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ evaluated Plaintiff's application for benefits under the required five-step sequential evaluation. *AR* at 12-23. At Step One, the claimant bears the burden of showing she has not been engaged in "substantial gainful activity" since the alleged date the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. Here, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. *AR* at 17.

At Step Two, the claimant bears the burden of showing that he has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff suffered from the following severe impairments: spondylolisthesis, status post-fusion, and osteoarthritis affecting both knees. *AR* at 17.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant

---

[5] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless noted otherwise.

is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's RFC and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. *AR* at 18. Next, the ALJ determined that Plaintiff retained the RFC to perform sedentary work except that Plaintiff could still stand or walk for three hours out of an eight-hour workday, shifting positions every 45 minutes to an hour; and, that Plaintiff could also perform occasional postural activities (such as stooping, crouching and crawling), and occasional overhead reaching, but that she must avoid concentrated exposure to extreme heat or cold, and avoid even moderate exposure to vibration and hazards. *AR* at 18-21.

At Step Four, the ALJ determined that based on the testimony of the VE, Plaintiff is not capable of performing her past relevant work as a grocery store employee or a nurse's assistant. *Id*. at 21. At Step Five, the burden shifts to the Commissioner to show that the claimant can perform some other work that exists in "significant numbers" in the national economy, considering the claimant's residual functional capacity, age, education, and work experience. *See* 20 CFR § 404.1560(b)(3). This burden can be satisfied in one of two ways, either "by the testimony of a vocational expert, or [] by reference to the Medical-Vocational Guidelines [found] at 20 C.F.R. pt. 404, subpt. P, app. 2." *Tackett v. Apfel*, 180 F.3d 1094, 1100-01 (9th Cir. 1999). Here, the ALJ concluded that based on the RFC as formulated, and the testimony of the VE, that Plaintiff could work in a number of capacities for which there exist jobs in significant numbers in the national economy, such as an elections clerk, charge account clerk, or call-out operator. *AR* at 21-22. Accordingly, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from June 21, 2009, through the date of the issuance of the ALJ's decision, March 15, 2017. *Id*. at 22-23.

## ISSUES PRESENTED

Plaintiff presents three issues for review and argues that the ALJ improperly rejected Plaintiff's testimony as well as the testimony of a lay witness, and that the ALJ erred at Step-5 by asking the vocational expert a flawed hypothetical based on a flawed RFC that was not supported by substantial evidence.

**DISCUSSION**

Plaintiff initially contends that the ALJ improperly discredited her testimony. *See* Pl.'s Mot. (dkt. 19) at 13-16. Specifically, Plaintiff takes issue with the fact that "the ALJ has not specified which [part of Plaintiff's] testimony she found not credible and has not provided clear and convincing reasons supported by evidence in the record to support her credibility determination." *Id*. at 15. Indeed, a review of the entirety of the ALJ's decision in this case reveals only an obscure and generalized single mention of the rejection of Plaintiff's testimony, coupled with an explanation that mischaracterized one of Plaintiff's testimonial statements. While the ALJ found that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms; [], the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *AR* at 19. It should be noted at this point that Plaintiff never testified that she *must* lay in bed and read all day; instead, this was her response when asked how she passes her time. *See id*. at 42-43 (Plaintiff was asked what she did with her time and what was the most comfortable position to be in during the day; she responded "[u]sually laying down . . . [p]retty much most of the day . . . I get up and [get] stuff and walk around . . . [but] the medicine makes me sleep."). For some reason, the ALJ latched onto this testimony and incorrectly interpreted it as Plaintiff claiming that she is completely bedbound.

Accordingly, the ALJ gave three reasons for rejecting Plaintiff's testimony. First, the ALJ found that while Plaintiff's condition could be reasonably expected to preclude prolonged walking or standing, "there is no basis for her alleged need to spend the day reading in bed." *Id*. at 20. Second, and building on this faulty foundation, the ALJ also found that being allegedly bedbound is inconsistent with Plaintiff's ability to occasionally prepare simple meals, do errands, drive a car, and "clean the house and do laundry with help from her children." *Id*. Third, and even more problematically, the ALJ also based the rejection of Plaintiff's testimony on the notion that "there is no evidence that the claimant has pursued treatment other than medications." *Id*.

In this court, the ALJ's misunderstanding of Plaintiff's testimony lives on through Defendant's arguments. Defendant responds to this assertion of error by claiming that "[a]lthough

13

Plaintiff claimed that she laid in bed most of the day, her treatment records did not reflect any such complaints and instead showed that she had full strength in her extremities and could walk well." Def.'s Mot. (dkt. 20) at 11. Thereafter, Defendant's arguments follow the path laid out in the ALJ decision, with Defendant asking, rhetorically, how it could be possible that Plaintiff needed to lay in bed all day and yet "had no problem bathing, dressing, and performing other self-care activities." *Id.* at 11-12. In repeating the third of the ALJ's bases for rejecting Plaintiff's testimony, Defendant's argument implicitly concedes that the hearing before the ALJ was a missed opportunity to properly develop the record in this case, because Defendant contends that "[s]ince Plaintiff did not seek other pain management modalities, it was reasonable for the ALJ to *infer* that Plaintiff's symptoms were not debilitating as alleged." *Id.* at 12 (emphasis added). First, the court will note that it is the ALJ's responsibility to develop the record sufficiently for a fair disability determination to be made on an adequate record. Second, it is unclear what other "pain management modalities" Defendant has in mind for Plaintiff. Plaintiff has undergone two surgeries which were later deemed unsuccessful, she has received a number of injections directly into her spine, and has otherwise followed every treatment prescribed by her physicians to the extent that her finances and insurance coverage would allow. *See* Pl.'s Mot. (dkt. 19) at 14.

In this Circuit, it is well established that when "an ALJ concludes that a claimant is not malingering, and that she has provided objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms alleged, the ALJ may 'reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492-93 (9th Cir. 2015) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). In this regard, it goes without saying that if an ALJ has misapprehended a claimant's testimony, the wholesale rejection of Plaintiff's *actual* testimony, if based on the misapprehension, is obviously not a "specific, clear and convincing reason" for the adverse credibility determination. The hearing before the ALJ in this case was an unrealized opportunity for either the ALJ or Plaintiff's counsel to question Plaintiff with enough specificity such as to develop a record of the actual parameters of Plaintiff's remaining ability to function. While Plaintiff did testify that she passed her time reading in bed,

14

she did not testify that she was completely bedbound.

Thus, the court first finds that the ALJ's rejection of some unspecified portions of Plaintiff's testimony was inherently erroneous because it lacked enough specificity for this court to determine exactly what testimony was rejected and what testimony was accepted. Second, the court also finds that rejecting any of Plaintiff's testimony based on the notion that there is no evidentiary support for her need to remain bedbound is erroneous because it was based on a fallacy, as Plaintiff never testified to that effect. More problematically, and as discussed further below, the ALJ in this case failed to sufficiently develop the record in a manner that would make the RFC, and the attendant hypothetical posed to the VE, understandable as being based on substantial evidence in the record.

Next Plaintiff argues that the ALJ erred in rejecting the lay testimony provided by Plaintiff's mother. Pl.'s Mot. (dkt. 19) at 16-17. Ms. Dias's third-party function report was described by the ALJ as claiming that Plaintiff "is limited in her ability to work due to back pain, inability to move, trouble bending, cannot stand for a long time, and because she stays in bed a lot." *AR* at 21. Without describing what was meant by staying in bed "a lot," the ALJ again simply stated "that the medical record does not support the level of dysfunction described. The claimant has never reported that she is bedbound and completely unable to do household chores . . . [and] claimant's ability to take care of personal hygiene and grooming suggests that her functioning is less limited than indicated." *Id*.

In response, Defendant again follows the ALJ's misapprehension of this testimony, however, the portion of the third-party function report to which Defendant and the ALJ made reference was also the subject of a misapprehension. Defendant argues that it was proper for the ALJ to give little weight to Ms. Dias's third-party function report because "Ms. Dias asserted that Plaintiff could not move . . . [that] Plaintiff stayed at home in bed, and she was unable to stand, walk, sit, perform postural activities, or complete tasks." Def.'s Mot. (dkt. 20) at 15 (citing a 6-page range of the mostly uncompleted third-party function report submitted by Ms. Dias). Nowhere in Ms. Dias's function report is it stated that Plaintiff is immobile or that she was bedbound. *See AR* at 204-09. First, when asked how Plaintiff's impairments limit her ability to

15

work, Ms. Dias simply wrote: "back pain, can't move, has trouble bending over, can't stand for a long time, stays in bed a lot." *Id*. at 204. Then, in response to a question on the pre-printed form that asked her to check any of the listed daily living activities affected by the claimant's impairments, Ms. Dias selected lifting, squatting, bending, standing, reaching, walking, kneeling, and stair-climbing. *AR* at 209. In response to a follow-up question asking how Plaintiff's impairments affect her abilities in these areas, Ms. Dias simply wrote that "with her 2 back surgeries she is still pain (sic) and unable to do these activities." *Id*. Thus, Ms. Dias did not state that Plaintiff's abilities in these areas were completely precluded, instead, her completion of that portion of the function report merely stated that Plaintiff's impairments *affect* those aspects of daily living, and that (at least in November of 2013) it was Ms. Dias's opinion that her daughter was unable to do these activities without enduring significant pain.

In order to discount the testimony of the lay witnesses, an ALJ must give specific reasons that are germane to that witness. *See Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993). While it is true that inconsistency with the medical evidence of record could constitute a germane reason to discount lay witness testimony – *see e.g., Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005); *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001); *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006)) – it is also true that an ALJ may not simply "discredit [the] lay testimony as not supported by medical evidence in the record." *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2008). On the other hand, here, the ALJ did not identify any specific inconsistencies, and only offered her conclusion that "the medical record does not support the level of dysfunction described . . . [because] [t]he claimant has never reported that she is bed-bound and completely unable to do household chores." *AR* at 21. The problem with this conclusion, as stated above, is that it was based on a fallacy as Ms. Dias's third-party function report cannot be fairly read to even imply that Plaintiff is a completely incapacitated and bedbound person with no ability to ambulate at all. Further, this case is distinguishable from *Bayliss*, in which the plaintiff argued the ALJ improperly rejected portions of lay witnesses testimony because the ALJ accepted testimony of the claimant's family and friends "that was consistent with the record of [her] activities and the objective evidence in the record; he rejected portions of their testimony that did not meet this standard."

16

*Bayliss*, 427 F.3d at 1211. Thus, in *Bayliss* it was found that an inconsistency with the medical record constituted a germane reason to reject the lay witness testimony, because "rejection of certain testimony was supported by substantial evidence." *Id*. While the ALJ indicated here that "the medical record did not support the level of dysfunction described," the ALJ did not identify which portions of Ms. Dias's statement were rejected or adopted; and, without such information, this court is unable to find substantial evidence supporting the rejection of those statements. Accordingly, the court finds that the ALJ also erred in rejecting Ms. Dias's statements while failing to provide any specific reasoning that would be germane to that witness.

Turning to the third and final issue, Plaintiff submits that the ALJ improperly omitted the limitations described by Plaintiff and her mother from the hypothetical that she posed to the vocational expert, rendering the VE's opinion baseless. Pl.'s Mot. (dkt. 19) at 18. Defendant responds to the effect that the "hypothetical question appropriately included the limitations that the evidence supported and which the ALJ included in Plaintiff's RFC." Def.'s Mot. (dkt. 20) at 16. Defendant adds that the limitations expressed in the hypothetical question were a slightly more restrictive set than what was opined as a result of the consulting examination by Dr. Brown, and that "no physician opined that Plaintiff had greater limitations than the ALJ assessed in Plaintiff's RFC." *Id*. at 17.

The record in this case does not manifest a body of substantial evidence on which the ALJ's hypothetical question, as well as the RFC, can be understood to be based. Therefore, the court will begin by noting that while it is true that it is incumbent on claimants to provide sufficient medical evidence of one or more disabling impairments, it has "long [been] recognized that the ALJ is not a mere umpire at [an administrative proceeding], but has an independent duty to fully develop the record[.]" *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992, as amended Sept. 17, 1992) (*per curiam*); *see also Sims v. Apfel*, 530 U.S. 103, 110-111 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). Included in this duty to develop the record properly is an obligation for the ALJ to take reasonable steps to ensure that issues and questions raised by medical evidence, particularly evidence from treating physicians,

17

are addressed so that the disability determination is fairly made on a sufficient record of information, be it favorable or unfavorable to the claimant. *See Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1999); and, *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978); *see also* 42 U.S.C. § 421(h).

Thus, an ALJ has not only the power, but a duty, to "conduct an appropriate inquiry" if the evidence is ambiguous or inadequate to permit a proper evaluation of a claimant's impairments. *Smolen*, 80 F.3d at 1288. If evidence from the medical sources is inadequate to fairly determine if someone is disabled, an ALJ may be required to re-contact medical sources as necessary, including a treating physician, to determine if additional needed information is readily available. *See* 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1); *see also Webb*, 433 F.3d at 687 ("[t]he ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence [or] the ALJ's own finding that the record is inadequate"). The responsibility to fulfill this duty belongs entirely to the ALJ; it is not part of the claimant's burden. *See e.g., White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2001); *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) ("This duty extends to the represented as well as to the unrepresented claimant . . . Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry . . . including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record.").

Here, the ALJ was presented with a body of medical evidence, described above, that presented some degree of ambiguity as to the precise contours of Plaintiff's remaining ability, if any, to function in the workplace. Plaintiff was the victim of an uncommon accident in that she was thrown into the air from the back of a motorcycle after the driver decided to execute a jump. Plaintiff then impacted the ground, in the seated position, with such force that one of her vertebra exploded. Plaintiff was then subjected to two surgeries involving the removal of her shattered T12 vertebra, the "fusing" and "fixing" together of two other pair of vertebrae using bone chips taken from elsewhere in her spine, an assortment of metal hardware, and "putty." Plaintiff then underwent a physical assault where her back impacted a door-jam, as well as a number of

18

subsequent injections into her spine, and was also given high doses of opiates for many years. When the sum of these treatments not only failed to abate Plaintiff's persistent and chronic pain – the second surgery actually worsened Plaintiff's pain – her treating physicians concluded that the surgeries had been unsuccessful, diagnosing her in 2016 with failed back surgery syndrome and post-laminectomy syndrome, as well as lumbar radiculopathy. In addition to these conditions, as well as Plaintiff's insomnia, and her chronic pain disorder, diagnostic imaging from 2016 showed a host of other problems with Plaintiff's spine that were likewise not accounted for or even mentioned in the ALJ's decision, including broad-based disc protrusion into the L3-L4 disc space causing a moderate narrowing of the left L3 neural foramen, and moderate degenerative arthritis in the facet joint at the L4-L5 vertebrae. Illustrative of the fact that the ALJ failed to develop the record in this case such that a disability determination could be fairly made with sufficient evidence, is the fact that none of these conditions were mentioned or discussed at Step-II or elsewhere in the ALJ's analysis.

In large part, the ALJ's hypothetical question for the VE, as well as the RFC in this case, was based on the January 2014 opinion of the one-time examination of a consulting physician, Dr. Brown. It is unclear from Dr. Brown's report how he opined that Plaintiff could sit, stand, or walk for up to 4 hours of an eight-hour workday; lift less than 10 pounds occasionally, and lift 10 pounds frequently (as mentioned above, this portion of Dr. Brown's opinion is ambiguous and confusing). Dr. Brown also opined that Plaintiff must avoid climbing, balancing, stooping, kneeling, crouching, and crawling, but that there were no limitations on her ability to reach, handle, finger, or feel things. As unclear as was the method used by Dr. Brown in determining Plaintiff's ability to, for example, stand for half of a full workday; it is equally unclear on what basis the ALJ modified Dr. Brown's opinion to form the RFC and the hypothetical questions that she asked the VE.

Because the ALJ failed to ask Plaintiff sufficiently detailed questions at the hearing, or to otherwise develop the record in a manner that would reveal the precise contours of Plaintiff's physical limitations by, for example, contacting her treating physicians, or Dr. Brown, or her surgeon, or even her mother, for needed clarification or additional information, the RFC and the

hypothetical questions have no apparent evidentiary basis in the record. It is not even possible to say that, despite some ambiguity with the hearing record, the ALJ based the hypothetical question and the RFC on Dr. Brown's functional limitations opinion. Dr. Brown opined that Plaintiff could stand for four out of eight hours; whereas the ALJ decided that Plaintiff could stand or walk for three out of eight hours while shifting positions every 45 minutes. While Dr. Brown opined that Plaintiff is incapable of postural movements such as stooping, kneeling, crouching and crawling, the ALJ's hypothetical (and RFC) envisioned a person who retained the ability to occasionally stoop, crouch, and crawl. In short, viewing the ALJ's modifications of Dr. Brown's opinion, they all appear to be arbitrary formulations based on the ALJ's own impressions of the record but with no actual basis in the evidentiary record. Likewise, when the ALJ asked the VE if there would be any employment for the hypothetical described if they were off-task for 20 percent of the workday, it is unclear how and why the ALJ came up with a factor of 20 percent, as such a suggested limitation does not appear to be part of the evidentiary record. In short, the court finds that the ALJ's Step-5 determination was not supported by substantial evidence.

While Plaintiff has requested that the court reverse the ALJ's non-disability finding and remand the case for calculation and payment of benefits, the court will decline that invitation because the record remains undeveloped and incomplete as it pertains to the precise contours of Plaintiff's limitations. Accordingly, the case is remanded for further proceedings consistent with the guidance provided herein.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 19) is **GRANTED** and Defendant's Cross-Motion for Summary Judgement (dkt. 20) is **DENIED**.

**IT IS SO ORDERED.**

Dated: September 25, 2019

ROBERT M. ILLMAN
United States Magistrate Judge